Good morning. We request each appellant to indicate how much time he or she would like for rebuttal. Would the clerk call the first case please? Good morning. May it please the court. My name is Nathaniel Giddings and I'm here today on behalf of the appellants, the Boards of Commissioners of Montgomery and Seneca Counties. At this time, I'd like to reserve three minutes for rebuttal. I'd like to focus on the Commerce Clause issue today unless your honors have any specific questions. And that issue is whether an exemption of a private entity from quote all state and local taxation is a valid exercise of Congress's commerce power as applied to a wholly local tax on the transfer of real property. I understand that other courts have come to a different conclusion than the one I'm advocating for. However, those courts, as well as the court below, erred in several important respects. First, this is concededly not a channels or an instrumentalities case, but a substantial effects case. The substantial effects test is not satisfied here because there is no jurisdictional limitation in the statute at issue and there is nothing in the legislative record nor in the factual record of this case suggesting that transfer taxes have any effect, let alone a substantial one, on interstate commerce. Second, holding otherwise would exceed the outer limits of the Commerce Clause by giving Congress power to displace any local regulation that impacts the prices paid for real estate simply because of the impact on price. And regardless of whether the activity itself has a substantial effect on interstate commerce, such a holding is inconsistent with Supreme Court precedent. As such, this exemption as applied to the transfer taxes exceeds Congress's commerce power. I'd like to begin by pointing out that there is a presumption against federal interference with state taxation. As the Supreme Court said in National Private Truck Council, the federal statutes must be interpreted in light of the strong background principle against federal interference with state taxation. And the Supreme Court explained this in the Goldrick v. Berwyn White Coal Mining Company when it said, there are many forms of tax whose burdens when distributed through the play of economic forces affect interstate commerce, which nevertheless fall short of the regulation of the commerce which the Constitution leaves to Congress. So are you saying then that Congress could not exempt these two entities from any state taxation at all? No, Your Honor. I think there are certain taxes that Congress could exempt these entities from. For instance, a mortgage transfer tax. And the reason that a mortgage transfer tax, as opposed to a real property transfer tax, it's a difference on where the tax is incurred. A mortgage transfer tax is on the transfer of the mortgage, which would more directly impact the secondary mortgage market operations in as much as it would directly increase the price paid for that mortgage in the secondary mortgage market. Why wouldn't the real estate transfer tax also impact the secondary mortgage market? Right. So in order to reach that conclusion, Your Honor, you have to draw several important inferences. The first thing I'd like to point out is that Fannie Mae and Freddie Mac paid real property taxation. There is no dispute about that in this case. And real property taxes are levied on an ongoing basis that is more than once and at a higher rate than the transfer taxes at issue. And Fannie Mae and Freddie Mac have never contended to my knowledge that their payment of property taxes impacts their secondary mortgage market operations. That's governed by a particular provision of the statute that allows for taxation of real property taxes by the state. Yes, Your Honor. So why would they be, if Congress has said Fannie and Freddie should pay those taxes, why would they be challenging them? Well, if you look at Fannie Mae and Freddie Mac's argument, Your Honor, it's that the transfer taxes increase their cost of doing business, thereby decreasing their ability to reinvest in mortgages and stimulate the reinvestment of mortgages in the primary thereby decreasing our ability to reinvest in mortgages. You could say that about any tax. But they pay these property taxes, which are levied at a higher rate and on an ongoing basis. And they've never argued that those taxes impact their ability to reinvest. But it's up to Congress. Congress made that judgment. It would be a different case if they were conceding without legislation that they had to pay property taxes. But they have no argument to make about that because Congress decided it for them. Your Honor, Congress decided that, quote, unquote, Fannie Mae were exempt from all state and local taxation. But there is simply nothing in the legislative record indicating that Congress thought about these transfer taxes, that issue. And under the Commerce Clause case law, you must examine the regulated activity. And the regulated activity here is the transfer taxes. Again, this is an as-applied challenge. Well, are you saying that it's a matter of interpretation that this is actually a property tax? We do make the argument in the brief, Your Honor, that this would fall within the real property exception, the exception to the exemption, if you will. I'm happy to discuss that. No, but maybe I misunderstood your last statement. I thought that, okay, so for the purpose of this argument, you're conceding that Congress made this distinction. They said pay property taxes. Correct. You don't have to pay other taxes. Okay, so your position is that Congress can't do that. No, Congress could exempt Fannie Mae and Freddie Mac from some state taxation. But not this one. But not this one. Correct, Your Honor. And that's because there is absolutely nothing in the legislative record or in the factual record of this case indicating that these taxes have a substantial effect alone or in the aggregate, all transfer taxes on interstate commerce. Fannie Mae and Freddie Mac don't even argue this in their brief, Your Honor. They say secondary mortgage market, it impacts prices, therefore, within Congress's commerce power. But that is not enough. As the Supreme Court explained in Wickard, perhaps as the Supreme Court said in Lopez, the farthest reaching example of Congress's commerce power, questions of the power of Congress are not to foreclose consideration of actual effects of activity and question upon interstate commerce. So you mentioned that all of the other circuits have ruled against you. Where did they go wrong on this point? Yes, Your Honor. I believe that those circuits conflated the secondary mortgage market with the primary housing market where these taxes are incurred. They are two different markets. In fact, there's three markets here. There's the secondary mortgage market, the primary mortgage market, and the primary real estate market. These taxes are incurred at the primary real estate market, which is two levels removed from where Fannie Mae and Freddie Mac are supposed to be operating. But that's of importance too, because in order for this Court to conclude that Congress rationally considered this or rationally concluded that these taxes could impact the secondary mortgage market, you'd have to say that Congress considered that Fannie Mae and Freddie Mac were considered to be part of the primary housing market. But there's important limitations in Fannie Mae and Freddie Mac's charters that limit the types of mortgages that they can invest in in the secondary mortgage market. So the purpose in putting those limits in place, I believe, was so that these mortgages would never enter foreclosure such that Fannie Mae and Freddie Mac would never even be liable for these taxes in the first instance. Well, explain this to me. When you have a house, a Fannie Mae or Freddie Mac house that's on the market, which happens? Yes. I mean, I'm not talking about the mortgage, them selling the mortgage or buying. Okay, so you have a house that's on the market. Now, how does this tax not affect that market? Which market, Your Honor? How does it not affect the ability to sell the house that has been mortgaged? How does the transfer tax, if at all, impact the sale of the real property? Yes. I don't know if it does, and to the point there's not any evidence that it does impact. This is a traditional closing cost in, I believe, 37 states. Indeed, Fannie Mae and Freddie Mac can negotiate who pays this transfer tax in a number of states, and I believe they may have done so in never contended that this impacts their ability to sell real property. But do you think Congress has to hold hearings every time it invokes the Commerce Clause? No, I don't believe that they do, Your Honor, but the Supreme Court in Lopez and Morrison made clear, and also Sebelius, that legislative findings, especially in close cases and cases where Congress is asserting power over purely local activities, such as the transfer of real property here, that legislative findings helped the court reach that conclusion. They helped the court determine that Congress considered this, that they considered that they had this reach within their commerce power. And in Lopez, there were no legislative findings. And the Supreme Court, sorry. Look, I was going to sort of ask you a basic question, which is you started out saying that they're private entities. Yes. Fannie and Freddie. If they were federal instrumentalities, would this argument that you're making in the Commerce Clause go away? Yes, it would, Your Honor. If Fannie Mae and Freddie Mac are federal instrumentalities for tax purposes, they would be constitutionally exempt versus statutorily exempt from all state taxation. Congress would have the power to say otherwise. But they are not federal instrumentalities for tax purposes. In Commodities Export Company v. Detroit International Bridge, this court in 2012 ruled that the Detroit International Bridge Company, even though it received authorization from Congress, a charter from Congress, and played a role in facilitating international commerce, that that alone was not enough to make it a federal instrumentality for tax purposes. And indeed, the court pointed to six different factors. For example, whether it was private or for-profit. Fannie Mae and Freddie Mac are undoubtedly for-profit companies. Whether the Fannie Mae and Freddie Mac were controlled by, I believe, their shareholders. They were a shareholder-owned company with independent board of directors. So under the Commodities Export Company test, which applied the LeBron standard, they're simply not federal instrumentalities that would be constitutionally immune. So this court needs to reach the statutory question. And another thing that the Supreme Court looks to is whether or not there's a jurisdictional statement in the statute. And a jurisdictional statement would limit the application of the law to those instances which have a substantial effect on interstate commerce. Indeed, this court in United States v. Chesney, 86 F. 3rd 564 in 1996, noted that Section 922 G1, unlike the section at issue in Lopez, which was Section 922 Q, they were part of the same larger statutory scheme, contained a jurisdictional element. And this court found that existence of a jurisdictional element important in finding that that statute, or that section of that statute, was constitutional in that case. Wickard, again, farthest reaching example of Congress's power. In Note 30, the Supreme Court noted that farms with less than 15 acres of wheat were exempted from the quotas. So there was no doubt in that case that the farm right issue farmed more than 15 acres, such that it brought it within. But that jurisdictional statement was important because Congress had considered that some farms were outside of Congress's commerce power. We simply do not have that here. And because we don't have that, it indicates that it is beyond Congress's commerce power. I see that I'm out of time, unless your honors have any further questions. Thank you, your honors. Good morning, and may it please the court. I'm Michael Johnson from Arnold and Porter. I represent the Federal Housing Finance Agency, and I'm arguing this morning on behalf of all the defendant appellees. We'll rest on our briefs on the carve-out issue, as the appellant hasn't argued that point. This morning, this is a Commerce Clause case. The recent Commerce Clause jurisprudence is dispositive. Lopez and Garcia, I'm sorry, favor the appellee's position strongly. In Rake, the Supreme Court held that if a general regulatory statute bears a substantial relation to commerce, the de minimis character of individual instances arising under that statute is of no consequence. In the Lopez case, the Supreme Court noted that if a federal statute is part of a larger regulation of economic activity, in which the regulatory scheme would be undercut unless the intrastate activity is regulated, the congressional statute would stand. In Lopez, the Supreme Court also noticed that Congress can regulate activities that arise out of or are connected with a commercial transaction, which viewed in the aggregate substantially affects interstate commerce. Your honor, those excerpts fit the facts of this case like a glove. Congress enacted a comprehensive scheme to facilitate and regulate the secondary mortgage market. The secondary mortgage market inherently involves, it is comprised of, investing in mortgages. It is inherent in mortgage investing that there will be, unfortunately, foreclosures, and necessarily, therefrom, there will be sales of property. Now, if that's an intrastate activity, the sale of the property, it's an intrastate activity that is connected with an interstate commercial transaction, the financing of the mortgage. That's the raison d'etre of Fannie Mae and Freddie Mac, to collect capital from money centers in the United States, New York, Cincinnati, Chicago, Los Angeles, and deploy it throughout the country in home mortgages, places like Albuquerque or Tallahassee or Indianapolis. That's interstate commerce. That's what Fannie and Freddie do. That's what Congress facilitated and regulated when it enacted their comprehensive charters. Would it undercut that comprehensive regulatory scheme if states could impose selective taxes on Fannie Mae and Freddie Mac? Of course it would. But are these selective taxes or are these just regular transfer taxes? I mean any taxes. I mean taxes other than real estate taxes, other than taxes to which real property is subject. Why would it undercut the regulatory scheme if Fannie and Freddie were subject to the panoply of taxes that states could come up with? Two reasons. It would increase the cost. Congress's objective in creating a secondary mortgage market and chartering Fannie Mae and Freddie Mac to facilitate that market was to reduce the cost of mortgage finance. So adding any cost is going to counteract Congress's objective in enacting these statutes. Secondly, Congress had the objective of making mortgage credit available more equitably throughout the nation. Now if states could settle on their own tax schemes and states would different levels of tax from each other to which Fannie and Freddie would be subject, that would undercut Congress's objective in creating a national market. So if we look at Gonzales v. Rake, which was the marijuana case, the court was extremely sensitive to the fact that anything that affects market conditions, that affects supply and demand in a nationwide market is fair game for Congress to regulate. And that's exactly what Congress did here. What about people, just mortgage companies that are independent, not FHA, but are just a mortgage company? They're obviously not covered under these statutes. So would that make FHA and Fannie Mae more competitive or less competitive if they had to do the same thing as a commercial? Fannie Mae and Freddie Mac would be, they would have less of the advantage that Congress deemed fit to confer on them if they were subject to the same taxes as other sources of funding. The whole purpose for Congress's creation of Fannie Mae in the Great Depression was because there was no secondary mortgage market. Congress deemed it appropriate to confer these advantages to create this Fannie Mae did its job well, so well that in the late 60s and early 70s, Congress thought it was appropriate to create Freddie Mac and create a competitor on the same terms. It did that. Freddie Mac flourished, did well, provided mortgage credit equitably throughout the nation at a low cost, fulfilling the federal mission that Congress chartered both enterprises with. Congress has amended both statutes from time to time over the years. And at each point, it has seen fit to leave the tax exemptions in place. That is Congress's judgment to make, and Congress has made that judgment that keeping these advantages in place facilitates its objectives of providing mortgage credit at a reasonable cost and on equitable terms throughout the nation. I guess I could agree with your argument, probably do, if it were a government instrumentality. Your brother counsel makes pretty good arguments, not a government instrumentality. Well, Mr. Giddings relies on a case that involves an enterprise that's quite a bit different from Fannie Mae and Freddie Mac. This circuit adopted the governing test not in the Detroit International Bridge case, but in the U.S. versus Michigan case, which involved federal credit unions. And the three factors that the court deemed of in that case were one, was the enterprise chartered by Congress? Credit unions, yes. Now, Mr. Giddings says the Detroit International Bridge Company had a federal charter. That's true, but only in a very limited and semantic sense. The Detroit International Bridge Corporation was a private company chartered under the laws of Michigan, permitted to pursue all corporate objectives that Michigan permitted. It was granted a federal license to operate the bridge. It's not a corporation chartered by Congress, given a federal mission, limited to that mission. Fannie Mae and Freddie Mac, created by Congress. Their charters give them a mission Congress deemed important, what we've been talking about, providing credit equitably and at a low cost throughout the nation. Fannie Mae and Freddie Mac are subject to pervasive federal supervision at all times. So those are the three factors this court deemed important for the federal instrumentality test in Michigan. Chartered by Congress, given a federal mission and limited to that federal mission, and subject to pervasive and constant federal supervision to ensure that the entity stays within the federal mission. All those apply to Fannie Mae and Freddie Mac. So are Fannie Mae and Freddie Mac federal instrumentalities? Yes. But does the court need to find that, need to rule that way to apply these statutory exemptions? No. The Supreme Court looked at that exact question, that exact question in the first Agricultural Bank of Berkshire County case, where the dispute, this involved a federal statute that prescribed the limits by which states could tax national banks. Again, financial institutions chartered by Congress, limited to a mission Congress thought was important, pervasively supervised by federal regulators. The Supreme Court, the question before the court was, could Massachusetts put an excise tax on national banks? The state of Massachusetts said, only if national banks are federal instrumentalities is that a fair statute. The Supreme Court had its debate. The majority said, we don't need to decide that. It is unnecessary, that's the principle point of contention between the majority and the dissent. So what the Supreme Court determined in First Ag is that it's not necessary to decide if an entity protected by a federal statutory exemption is a federal instrumentality. First Ag isn't the only are exempt from certain kinds of state and local taxation. Government contractor cases, U.S. versus New Mexico. That's a case where New Mexico was trying to tax a federal contractor, private entity providing services to the federal government. Contractors said, hey, we're entitled to share in the government's constitutional immunity. Supreme Court said no. But in the course of saying no, the Supreme Court first, in one paragraph, noted the sensitivity to issues of state sovereignty and the state power to tax. And then in the very next paragraph said, if Congress wants to change this, it's prerogative. So the Supreme Court is telling Congress, if you think it's very important for federal contractors to be exempt from state and local taxation, go ahead and enact the statute. What kind of showing do you have to make, if any? I mean, the main objection in relation to the Commerce Clause here today is that there's no showing that these transfer taxes would have any impact whatsoever on the agency. We, it's a rational basis. So there does not need to be an evidentiary showing. It's apparent to the naked eye because this is an increased cost and the possibility of variation among the states is obvious. So this is under the standards articulated in Lopez and Gonzalez v. Rake. It's a situation where the impact on supply and demand, market conditions in a nationwide market, is apparent to the naked eye. There do not need to be any findings. Mr. Giddings... But your opponent argues that those cases really do require that there be findings. Not so, Your Honor. The statements are quite clear in Gonzalez v. Rake that findings can be helpful, but they are not required. This is a rational basis standard where the court's job is not to evaluate the rationale Congress provided, but only to determine whether Congress could have had a rational basis. It certainly could have, and I think the evidence, just from the language of the statute, we don't, I don't believe there is a great deal of legislative history on point on why these provisions were included, but just from looking at the statute, it's apparent what Congress was trying to do and it is rational to reduce all those costs. Mr. Giddings talked a lot about whether there is a jurisdictional provision in the statute. That again is something that could be helpful but is not required, but there is a jurisdictional provision in the statute. This statute doesn't exempt anyone selling a house in foreclosure. It covers only the two federally chartered, federal mission, federally supervised enterprises, Fannie Mae and Freddie Mac. The jurisdiction of the statute is limited to those two entities, so there is a jurisdictional provision. There is no reason this Court should split with the 3rd, 4th, 7th, or 8th Circuits or depart from the reasoning inherent in the prior panel's decision. I see my time is up. I appreciate the Court's attention. Thank you. May it please the Court. Patrick Erta for the United States. Your Honors, Congress had a rational basis for concluding that the statutory exemptions would facilitate interstate commerce. And Judge White, to your question, Mr. Johnson got it totally right. It's a question of did Congress have that rational basis? And that is pretty obvious from the Supreme Court's holdings in HODL dealing with the displacement of traditional police powers, which is analogous here. And I think that the 3rd Circuit put it well in Delaware County, explaining to Mr. Gidding's point, our general reluctance to hold traditional state powers preempted is an interpretive principle that guides how we construe statutes, not a heightened constitutional standard of review. So the normal rational basis standard of review applies here. What does that tell us, Judge? What is the rational basis for this statute then? I think that the two considerations that Mr. Johnson pointed out, both the equivalence across the nation of mortgage lending capital, and then it makes sense because that's exactly what Congress was trying to do. I mean, there was a substantial effect, and I think that even Mr. Giddings agreed to this, on interstate commerce by Fannie and Freddie. He tries to break it down into three different markets. But as Mr. Johnson correctly pointed out, those markets are intertwined. So the real question is, when Congress exempted as part of this grand statutory scheme, creating Fannie and Freddie to facilitate the interstate traffic and mortgage lending capital, whether these exemptions were reasonably related to facilitating those missions. They certainly are, for those two reasons. So that rational basis is there, Judge Moore. One point on federal instrumentality that Mr. Johnson made, and we would like to echo, as we seem to be doing all day, you don't need to reach the federal instrumentality question. The Supreme Court's been pretty clear, First Ag, the contractor cases, even the case, I believe it's United States versus District of Columbia, that Mr. Giddings cited in his brief, expressly conceded that Congress has the ability, through its commerce power, to exempt private entities. So the question, Judge, is not so much can they only do it through the establishment of granted by Congress. It is, and it's within the commerce power. If there are no questions, thank you. Your Honors, they made several points that I'd like to briefly address. The first one, and I think it's interesting, they don't ever say that these taxes themselves have a substantial effect on interstate commerce. But they're captured in this larger regulatory, this comprehensive regulatory regime. And this is interesting, because Fannie Mae and Freddie Mac's charters are not comprehensive regulatory regimes. Examples of comprehensive regulatory regimes are things like the Endangered Species Act, the Clean Air Act, the Controlled Substances Act at issue in Rake. What we have here is corporate charters. They're 40 pages long in a PDF. We do not have the type of omnibus comprehensive bill that regulates the in and outs of every type of activity with definitions or jurisdictional statements that we have in the Clean Air Act and the Clean Water Act. But more to the point, McGoldrick made clear, McGoldrick is a very interesting case, and I'd ask your Honors to read it. It's 309 U.S. 33. Supreme Court in 1940 said, quote, it was not the purpose of the Commerce Clause to relieve those engaged in interstate commerce of their just share of state tax burdens merely because an incidental or consequential effect of the tax is an increase to the cost of doing business. And that's exactly what Fannie Mae and Freddie Mac are arguing here. They're saying, if we have to pay these taxes, it's going to increase the cost of our doing business. But that would be the same about any local property regulation, zoning laws, criminal laws, school funding laws. There are simply no limits to Fannie Mae and Freddie Mac's argument. And as the concurrence pointed out in Sebelius, the inability of the U.S. government in that case to articulate a non-constitution based limit on its argument was a reason why their conception exceeded the outer limits of the Justice Roberts in Sebelius pointed out that these zoning and police and school laws were examples of laws within the state's plenary authority. But under Fannie Mae and Freddie Mac's argument, Congress could reach those activities merely because they impact the price paid for real estate, because they're part of the national housing market. But as we make clear in our brief, there is no really such thing as a national housing market. It's all very localized, dependent on local laws. And again, under the defendant's argument, Congress could reach those laws. As to the point about whether or not Fannie Mae and Freddie Mac are federal instrumentalities, US v. Michigan was decided in 1988. Commodities Export Company was in 2012. LeBron was in 1995. Commodities is the controlling test, and under that test, they are not federal instrumentalities. And again, Your Honor, I'd like to emphasize there is nothing in the record. Wickard said this court should consider the actual effects on interstate commerce. So if Your Honors are uncomfortable holding the statute unconstitutional as is, remand to develop a factual record in this case would also be appropriate and within the realm of this court's power. If there are no further questions, thank you for your time. Thank you all for your argument. The case will be submitted with the